Janis **MAYNARD**, Appellant–Employee,

v.

**LESTER E. COX MEDICAL CENTER/OXFORD HEALTHCARE,**
Respondent–Employer.

No. 25112.

Missouri Court of Appeals,
Southern District,
Division Two.

May 19, 2003.

Motion for Rehearing or Transfer to
Supreme Court Denied June 10, 2003.

Application for Transfer Denied
Aug. 26, 2003.

William W. Francis, Jr., Terry W. Dodds, Placzek & Francis, Springfield, for appellant.

Michelle D. Voss, Schmidt, Kirby & Sullivan, P.C., Springfield, for respondent.

JOHN E. PARRISH, Judge.

Janis Maynard (claimant) appeals a final award of the Labor and Industrial Relations Commission (the commission) denying compensation for injuries to her left shoulder and upper extremities (wrists to elbows). The commission's denial of benefits was based on a determination that Lester E. Cox Medical Center/Oxford

Healthcare (employer) had not been the last employer to expose claimant to the activities that produced the occupational injuries; that the last exposure rule, § 287.063, precluded recovery.[1] This court reverses and remands.

Claimant was employed by employer from March 25, 1996, to May 2, 1997. She was on medical leave of absence from October 30, 1996, to May 2, 1997. Claimant described her work duties for employer:

> My job duties were in the office, I was reviewing nurses' reports, also doing physical therapy, occupational therapy, and speech therapy reports, pulling records. I was also reporting on the labs that would come into the office on new patients and I was also documenting doctors' orders and logging them into notebooks and then delivering them to the doctors' office and then picking them up.

Claimant told the administrative law judge (ALJ) that the notebooks or binders she worked with were "approximately one inch binders, three-ring binders" that held from three to ten laminated pages. Her job involved constant use of her arms and hands. She would place "orders" into binders, then "log[ ] them in" on a separate piece of paper in another binder. She explained she would receive the orders back, log them in again, "take the report out of the book and then file them in a basket to be filed away in medical records." Claimant used her fingers in pinching and gripping motions in working with the medical records. She worked updating and delivering the records eight hours a day, five days a week. Claimant explained that the part of her job that required her to deliver binders was done four days a week; that the average "heavy days" were three days a week.

Claimant was asked the following questions and gave the following answers about her delivery duties:

Q. Let's go through the actual mechanical process of how you prepared these binders for delivery. What would you do with the individual binders?

A. Okay. As I put the orders into the binders then I would but [sic] them into the crate and then—one by one, and then also stack the next crate on top of it and then put the binders in there and secure it to the—

Q. How many binders could you usually get in a crate?

A. I believe I had counted once that I could get anywhere from 13 to 14—12 to 13 binders in a crate.

Q. And how many crates would you load up and carry?

A. I had two crates and again I had some instances where I had more binders than I had crates so I would put them on top.

Q. Then you would take the crates to your car?

A. Yes.

Q. Where would you put them?

A. In the back seat of my car.

Q. And you obviously had to open and close the door?

A. Right.

Q. Then what would you do once you got the loads into the car?

A. Then I would drive to the physician's office to where I needed [sic] make the delivery or the pickup because I also had pickups in addition to the deliveries from previous binders that were left.

Q. Would you have to carry the crates in and out of the buildings?

---

1. References to statutes are to RSMo 1994.

A. There was times where I didn't have to. I just carried the binders and then there was also times where I had to take the complete basket into the building because there were several doctors within the facility.

Claimant told the ALJ that in one day she counted up to 110 times when she and an assistant went in and out of physicians' office doors while they carried crates.

The first physical problem claimant noticed occurred "[a]nywhere between June and July" of 1996 when she experienced pains in her wrists, hands, and left shoulder. Claimant reported her discomfort to employer and asked for a desk with a file drawer on the right—her workstation was a desk with the file drawer on the left. Claimant's supervisor told her that the only thing appropriate for the area where claimant was sitting was "a left-handed desk." Claimant continued to do her job with the same equipment.

On August 20, 1996, claimant was delivering orders to doctors' offices. She was taking baskets in which the binders were carried out of her car, putting them on a cart and strapping them down, when one of the baskets slipped off. When the records began to fall, claimant tried to grab them and felt a very sharp pain in her left shoulder. She described the sensation she experienced as being "like someone was sticking a knife into your shoulder and twisting it."

Claimant initially sought treatment from her family physician for pain in her wrists and left shoulder. A mild pain reliever was prescribed, and physical therapy was prescribed for claimant's left shoulder. Claimant's family physician, Dr. Younker, referred her to Dr. Laurie Behm. Dr. Behm diagnosed carpal tunnel syndrome. Claimant was sent to Dr. Joel Tupper for surgical evaluation.

On March 3, 1997, claimant had surgery on her right shoulder. Carpal tunnel release was performed on her left hand November 20, 1997, and on her right hand December 16, 1997. A cubital tunnel release to claimant's elbow was performed March 31, 1998.

Claimant filed two claims. The first, filed April 7, 1997, was for injury to her left shoulder that occurred August 20, 1996, while lifting medical records. The second, filed August 15, 1997, was for injuries to claimant's wrists and elbows that resulted from making deliveries of documents. The second claim was later amended to include "both wrists to elbow" and "both arms and body as a whole." She reported that "[f]ollowing repetitive use of hands [she] ha[d] developed bilateral carpal tunnel arising out of the course and scope of her employment."

The claims were consolidated for hearing. The ALJ found claimant's injuries arose out of and in the course of her employment with employer. The ALJ awarded claimant permanent partial disability benefits. The commission reversed. The commission held it was required to follow the reasoning in *Endicott v. Display Technologies, Inc.,* 77 S.W.3d 612 (Mo. banc 2002), in applying the last exposure rule pursuant to § 287.063 and § 287.067. The commission concluded that it "must look to the date claimant filed the claim and whether more than ninety days had passed since working for Lester E. Cox Medical Center/Oxford Healthcare. If so, [it] must then look to see if there was extremity intensive employment for a period of ninety days or more during this subsequent period of employment."

The commission found that at the time claimant filed her first claim, she had not worked for employer for five months; that claimant had three subsequent employers during that five-month period. The com-

mission found the work claimant performed for the subsequent employers was repetitive in nature.

Claimant's first point on appeal asserts the commission erred in reversing the award of the ALJ and entering a final award of no compensation. Claimant contends the commission misinterpreted and misapplied the holding of *Endicott v. Display Technologies, Inc., supra,* in that it concluded subsequent employment of claimant was the cause of her condition with no substantial, competent, or credible evidence to support that determination.

Section 287.063.1 and .2 addresses liability for occupational disease. It provides:

1. An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when for any length of time, however short, he is employed in an occupation or process in which the hazard of the disease exists, subject to the provisions relating to occupational disease due to repetitive motion, as is set forth in subsection 7 of section 287.067, RSMo.

2. The employer liable for the compensation in this section provided shall be the employer in whose employment the employee was last exposed to the hazard of the occupational disease for which claim is made regardless of the length of time of such last exposure.

Subsection 7 of § 287.067, to which § 287.063.1 refers, states:

With regard to occupational disease due to repetitive motion, if the exposure to the repetitive motion which is found to be the cause of the injury is for a period of less than three months and the evidence demonstrates that the exposure to the repetitive motion with a prior employer was the substantial contributing factor to the injury, the prior employer shall be liable for such occupational disease.

The employee who sought benefits in *Endicott* worked for Display Technologies, Inc., (Display Tech.) from 1981 to January 1998. He worked for ASAP Services, Inc., (ASAP) from February to March 1998, for ADECCO Employment Services, Inc., (ADECCO) from April to July 1998, and for Graphic Technologies, Inc., (GTI) from July 1998 to March 2000. The employee was diagnosed with mild-to-moderate right carpal tunnel syndrome and mild left carpal tunnel syndrome in July 1993. He settled a claim with Display Tech in June 1994 for wrist disability. For the next three years, the employee had supervisory duties that did not require repetitive handwork.

From October 1997 to January 1998, he performed different tasks related to Display Tech going out of business. Problems with his upper extremities reappeared. In February and March the employee worked for ASAP. His job with ASAP was similar to the job he had with Display Tech. On March 2 the employee was diagnosed with right elbow bursitis. ASAP assigned him to GTI for duties that included repetitive action. On July 17, he became a permanent employee of GTI.

The employee in *Endicott* filed for compensation November 2, 1998. He alleged an onset date of December 1997, when he had done disassembly work for Display Tech. He was diagnosed with bilateral thoracic outlet syndrome on January 25, 1999. He thereafter amended his claim.

The evidence in *Endicott* was that the employee's employment with Display Tech, ASAP and GTI had each been capable of causing the problems the employee exhibited. The employee alleged, however, that most of his problems occurred during the time he worked for Display Tech; that they worsened while he worked for ASAP. He asserted that his problems "seemed to

reach a steady state" and did not worsen additionally while he worked for GTI. 77 S.W.3d at 614.

The commission in *Endicott* found the employee's employment with each employer was a substantial contributing factor to his injuries; however, the employee's doctor concluded the most substantial contributing factor to the employee's injuries was his work at Display Tech. The doctor concluded the work at Display Tech was, in effect, the cause of the employee's injuries.

In imposing liability, the commission in *Endicott* used the dates of diagnosis, not the date of the claim, for the purpose of assessing damages among employers. *Endicott* states that the last exposure rule is not a rule of causation. "Rather, as the starting point, the last employer *before the date of claim* is liable *if that employer exposed the employee to the hazard of the occupational disease.*" *Id.* at 615 (emphasis added). *Endicott* held that because the employee's duties at GTI included repetitive motion and because GTI was the last employer and the claim had been filed more than 90 days after the employee had become an employee of GTI, GTI was solely liable.[2] For the holding in *Endicott* to apply to this case, claimant must have had employment subsequent to her employment with employer for more than 90 days before her claims were filed and claimant must have been exposed to the hazard of the occupational diseases claimant contracted.

Point I does not contest the commission's finding that the date of the claims in the case now before this court were more

than 90 days after claimant had other employment, the date *Endicott* declared to be the "starting point" for ascertaining if the exception to the last exposure rule applies. Point I argues, however, that in this case, unlike in *Endicott*, there was no substantial, competent, or credible evidence that claimant was exposed to the hazard of the occupational disease in her subsequent employment. For the liability for claimant's occupational diseases to subsequent employers, claimant would have to have been "employed in an occupation or process in which the hazard of the disease exists." § 287.063.1. *See Maxon v. Leggett & Platt,* 9 S.W.3d 725, 730 (Mo.App.2000). Claimant's appellant's brief succinctly states her argument as follows:

Despite the fact that the employer had presented evidence that employee had subsequent part-time employment following her last date of employment with employer, there was absolutely no evidence presented at the hearing proving that the duties employee performed while at these subsequent employers were repetitive in nature, or that the performance of these duties in any way caused or contributed to cause her conditions medically. Therefore, the Commission's decision misinterprets and misapplies the decision in *Endicott* in that the opinion concludes that employer is not liable as a matter of law simply because employee was subsequently employed for a period of more than three months without requiring the employer to prove that the subsequent employment exposed her to a repetitive motion capable of causing her injuries, and that the motion was the "substantial contrib-

---

**2.** GTI sought to invoke the exception for occupational diseases due to repetitive motion provided by § 287.067.7. In denying GTI's attempt to apply the exception, *Endicott* held "this provision shifts liability to a prior employer *only* if the employee's exposure at a later employer is less than three months *and*

exposure with a prior employer was the substantial contributing factor to the injury." 77 S.W.3d at 615. *Endicott* states, "If this exposure with an employer is for more than three months, that employer ... may not invoke the exception in section 287.067.7." *Id.*

uting factor to the injury", as is further required by § 287.063.

This court agrees. Employer's evidence with respect to the cause of claimant's injuries was directed to occurrences prior to her employment by employer—a 1994 automobile accident—coupled with their experts' opinions that claimant's duties and responsibilities for employer did not cause or contribute to cause the injuries for which she sought compensation. Although employer suggests that testimony of claimant's medical experts permits the conclusion that claimant's injuries were a result of her subsequent employment, the record does not support that assessment. This court discovered no medical opinion in its review of the evidence that states the subsequent employment exposed claimant to repetitive motions capable of producing the injuries for which she sought benefits. Point I is granted.

Point II is a recasting of the issue discussed in Point I regarding sufficiency of evidence to support the commission's finding that claimant's subsequent employment caused or contributed to cause her injuries. Point II argues that the commission erred in reversing the ALJ's award for claimant and entering an award of no compensation because the record did not provide evidence on which a determination could be made that subsequent employment was a causal factor in claimant's injuries. For the reasons previously stated, Point II is granted. The award is reversed. The case is remanded with directions to the commission to adopt the award of the ALJ as the award of the commission.

RAHMEYER, C.J., and ANDERSON, Sr. J., concur.